**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NJ MOBILE HEALTH CARE LLC, *et al.*[1], | : | (Subchapter V) |
|  | : |  |
|  | : | Case No. 24-16239 (JKS) |
| Debtors. | : |  |
|  | : | (Jointly Administered) |

------------------------------------------------------------------- x

## SMALL BUSINESS DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION

This First Amended Plan of Reorganization is presented to you to inform you of the proposed Plan for restructuring the debt of the above-captioned Debtors, and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appears at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY DECEMBER 10, 2024.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY DECEMBER 10, 2024. THE BALLOT MUST BE MAILED TO THE DEBTORS' COUNSEL'S ADDRESS: KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP, 200 WEST 41st STREET, 17th FLOOR, NEW YORK, NEW YORK 10036, ATTN: TRACY L. KLESTADT & ANDREW C. BROWN.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR DECEMBER 17, 2024 IN   COURTROOM NO. 3D AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY, 50 WALNUT STREET, 3rd FLOOR, NEWARK, NEW JERSEY, 07102.**

---

[1] The Debtors herein and the last four digits of their respective tax identification number are: (i) NJ Mobile Health Care LLC (9666), (ii) Lime Line Operations LLC (8248), (iii) SSME Services LLC (4127). The Debtors' principal place of business is 575 Corporate Drive, Suite 525, Mahwah, New Jersey 07430.

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

November 15, 2024

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Tracy L. Klestadt
Andrew C. Brown
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
        abrown@klestadt.com

*Attorneys for the Debtors and Debtors-in-Possession*

## <u>TABLE OF CONTENTS</u>

SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS ....................................1

I.      Overview of Go-Forward Operations ...........................................................................1

II.     Proposed Treatment of Creditors ................................................................................1

ARTICLE 1: HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR......................3

1.1.  Nature of the Debtors' Business ........................................................................3

1.2.  History of Business Operations of the Debtor ..................................................3

1.3.  Filings of the Debtor's Chapter 11 Case ...........................................................3

1.4.  Legal Structure and Ownership .........................................................................3

1.5.  Debtors' Assets...................................................................................................3

1.6.  Debtors' Liabilities.............................................................................................4

1.7.  Current and Historical Financial Conditions ....................................................4

1.8.  Events Leading to the Filing of the Bankruptcy Case ......................................4

1.9.  Significant Events During the Bankruptcy Case ...............................................4

1.10. Projected Recovery of Avoidable Transfers......................................................5

ARTICLE 2: THE PLAN .......................................................................................................5

2.1.  Unclassified Claims ...........................................................................................6

    A.  Administrative Expenses ..........................................................................6

    B.  Priority Tax Claims ..................................................................................7

2.2.  Classes of Claims and Equity Interests .............................................................8

    A.  Classes of Secured Claims .......................................................................8

    B.  Classes of Priority Unsecured Claims.....................................................12

C.  Classes of General Unsecured Claims ...................................................13

D.  Class of Equity Interest Holders ........................................................14

2.3.  Estimated Number and Amount of Claims Objections ..............................................14

2.4.  Treatment of Executory Contracts and Unexpired Leases.........................................15

2.5.  Means for Implementation of the Plan.......................................................15

2.6.  Substantive Consolidation for Plan Distribution Purposes Only ..............................16

2.7.  Payments .............................................................................16

2.8.  Post-Confirmation Management..............................................................16

2.9.  Tax Consequences of the Plan .............................................................17

2.10. Projections in Support of Debtor's Ability to Make Payments Under the Proposed
      Plan ...............................................................................17

ARTICLE 3: FEASIBILITY OF PLAN.........................................................17

3.1.  Ability to Initially Fund Plan ...........................................................17

3.2.  Ability to Make Future Plan Payments and Operate Without Further
      Reorganization .....................................................................17

ARTICLE 4: LIQUIDATION ANALYSIS.........................................................18

ARTICLE 5: DISCHARGE....................................................................18

ARTICLE 6: GENERAL PROVISIONS .........................................................18

6.1.  Title to Assets ...................................................................18

6.2.  Binding Effect ....................................................................19

6.3.  Severability ......................................................................19

6.4.  Retention of Jurisdiction by the Bankruptcy Code ..................................19

6.5.   Captions ...................................................................................................19

6.6.   Modification of Plan ...............................................................................19

6.7.   Final Decree ............................................................................................20

ARTICLE 7: ATTACHMENTS.................................................................................20

ARTICLE 8: FREQUENTLY ASKED QUESTIONS................................................21

ARTICLE 9: DEFINITIONS......................................................................................22

9.1.   The Definitions .......................................................................................22

9.2.   Administrative Claimant .........................................................................22

9.3.   Administrative Convenience Class ..........................................................22

9.4.   Administrative Expense ...........................................................................22

9.5.   Administrative Tax Claim ........................................................................22

9.6.   Allowed Claim .........................................................................................22

9.7.   Allowed Priority Tax Claim.....................................................................22

9.8.   Allowed Secured Claim ...........................................................................23

9.9.   Allowed Unsecured Claim .......................................................................23

9.10. Bankruptcy Code or Code.........................................................................23

9.11. Bankruptcy Court .....................................................................................23

9.12. Bankruptcy Rules .....................................................................................23

9.13. Cash..........................................................................................................23

9.14. Chapter 11 Cases......................................................................................23

9.15. Claim.........................................................................................................23

9.16. Class..........................................................................................................23

9.17. Confirmation ............................................................................................23

9.18. Confirmation Date ...............................................................................................23

9.19. Confirmation Hearing .........................................................................................24

9.20. Confirmation Order ............................................................................................24

9.21. Creditor ..............................................................................................................24

9.22. Debtors and Debtors-in-Possession ...................................................................24

9.23. Disputed Claim ...................................................................................................24

9.24. Distributions .......................................................................................................24

9.25. Effective Date .....................................................................................................24

9.26. Equity Interest ....................................................................................................24

9.27. Executory Contracts ...........................................................................................24

9.28. Final Order .........................................................................................................24

9.29. IRC .....................................................................................................................24

9.30. Petition Date .......................................................................................................24

9.31. Plan ....................................................................................................................24

9.32. Priority Tax Claim ..............................................................................................24

9.33. Reorganized Debtors ..........................................................................................24

9.34. Schedules ...........................................................................................................25

9.35. Secured Creditors ...............................................................................................25

9.36. Trustee ...............................................................................................................25

9.37. Unsecured Creditor .............................................................................................25

## <u>SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS</u>

<u>I. Overview of Go-Forward Operations</u>

As outlined in more detail below, the Debtors have reached an agreement with a third-party to provide staffing and management services. It is the intention that the third-party entity will house the employees of the Debtors and fund the operating expenses related to said employees, including, but not limited to, employee payroll. The third-party has agreed to fund these employee-related operating expenses and then issue monthly invoices to the Debtors for said operating expenses. Through this arrangement, the Debtors anticipate significantly increasing their current operational capacities thereby generating the increased go-forward revenue which will be utilized, in part, to fund the Plan payments to Creditors outlined herein.

As also outlined below, it is the Debtors' intention to effectuate their substantive consolidation, for distribution purposes only, via confirmation of the Plan.

<u>II. Proposed Treatment of Creditors</u>

Allowed Administrative Claims shall be paid in full in the Allowed amount of such Administrative Claim in Cash from the Debtors' assets either: (i) within fifteen (15) Business Days after the date on which the Bankruptcy Court enters an order allowing such Administrative Claim; (ii) on the Effective Date of the Plan; or (iii) upon such later date as the Debtors and the holder of such Allowed Administrative Claim otherwise agree in writing.

Priority Tax Claims to receive Cash in an amount equal to their Allowed amount in equal quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which the Bankruptcy Court enters an order allowing such Priority Tax Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 1(a)-(c), 2(a)-(b), 3, 5, and 6.

Each holder of a Claim in Classes 1(a)-(c) to receive Cash in an amount equal to the Allowed amount of its respective Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each respective Class 1(a)-(c) Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6.

Each holder of a Claim in Classes 2(a)-(b) to receive Cash in an amount equal to the Allowed amount of its respective Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each respective Class 2(a)-(b) Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable

income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 1(a)-(c), 5, and 6.

Each holder of a Class 3 Claim to receive Cash in an amount equal to the Allowed amount of its Class 3 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each Class 3 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 1(a)-(c),  2(a)-(b), 5, and 6.

Each holder of a Class 4(a)-(b) Claim will receive Cash in an amount equal to the Allowed amount of its respective Claim on the later of (i) the Debtors' successful sale of the applicable collateral securing said Claimant's Claim, such sales each being subject to Bankruptcy Court approval, and (ii) within fifteen (15) Business Days after the date on which the Bankruptcy Court enters an order allowing such Claim, or upon such later date as the Debtors and the holder of such Allowed Class 4(a)-(b) Claims otherwise agree in writing.

Each holder of a Class 5 Claim to receive Cash in an amount equal to the Allowed amount of its Class 5 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each Class 5 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims.

Each holder of a Class 6 Claim to receive Cash in an amount equal to the Allowed amount of its Class 6 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each Class 6 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Class 5.

Each holder of a Class 7 Claim shall receive a pro rata share based on the Allowed amount if its Class 7 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of (x) the Effective Date and (y) the date on which each Class 7 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations available after payment in full of all Allowed Claims in Classes 1(a)-(c), 2(a)-(b), 3, 4(a)-(b), 5, and 6, Priority Tax Claims, and other costs of administration, including all Allowed Administrative Claims. The Debtors project that pro rata distributions to holders of Allowed Class 7 Claims will total approximately 10-100% of each holder's respective Allowed Class 7 Claim.

## ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1.    Nature of the Debtors' Business

The Debtors operate an emergency and non-emergency medical services and ambulance transportation business in the Northern New Jersey area. The Debtors' services include, among other things: (i) non-emergency medical transportation for patients to/from healthcare facilities, hospitals, and residential homes, on both a recurring or one-time basis, (ii) emergency medical services and transportation, and (iii) onsite medical support solutions and care for public and special events.

### 1.2.    History of Business Operations of the Debtor

NJ Mobile Health Care LLC ("NJMHC") was formed in 2014 and has since been serving the communities of the northern New Jersey area. NJMHC is licensed by the New Jersey Department of Health Office of Emergency Medical Services to serve as an emergency medical services provider at both the Basic Life Support (BLS) and Specialty Care Transfer Unit (SCTU) level. Over the years, NJMHC has provided both emergency and non-emergency ambulance services to both its contracted and "call for service" partners, including both healthcare facilities and municipalities.

### 1.3    Filing of the Debtor's Chapter 11 Case

On June 20, 2024, each of the Debtors filed voluntary petitions for relief under the Bankruptcy Code. Each of the Debtors' Chapter 11 cases are pending in the United States Bankruptcy Court in Newark, New Jersey (each of the Debtors' Chapter 11 cases collectively, the "Chapter 11 Cases").

### 1.4.    Legal Structure and Ownership

NJMHC is owed ninety-nine percent (99%) in part by NJ EMS Ventures LLC and one percent (1%) in part by NJ Emergencies Made Simple, LLC.

Lime Line Operations LLC ("Lime Line") is owed ninety-nine percent (99%) in part by Louis V. Greco, III and one percent (1%) in part by 160 17th Street, LLC.

SSME Services LLC ("SSME" and together with NJMHC and Lime Line, the "Debtors") is owed ninety-nine percent (99%) in part by Louis V. Greco, III and one percent (1%) in part by 160 17th Street, LLC.

### 1.5.    Debtor's Assets

See **Exhibit "A"** attached hereto are the Debtor's projections which includes a consolidated list of the Debtors' assets.

1.6.    **Debtor's Liabilities**

See **Exhibit "A"** attached hereto for a consolidated list of the Debtors' liabilities.

1.7.    **Current and Historical Financial Conditions**

NJMHC originated in 2014 to provide emergency and non-emergency ambulance services to the communities of Northern New Jersey. Since then, NJMHC evolved into one of the prominent ambulance service providers in Northern New Jersey. As time has passed, NJMHC has expanded its range of services beyond its primary emergency and non-emergency ambulance services to include both training and educational services, including both in-service employee training and external training to emergency medical technicians (EMTs) and other first responders. Unfortunately, the residual impact of the COVID-19 Pandemic, industry headwinds, and certain issues with third-party billing providers has led to significant downsizing of the Debtors' operations causing a significant decrease in the Debtors' ability to generate revenue in the lead up to and following commencement of these Chapter 11 Cases.

1.8.    **Events Leading to the Filing of the Bankruptcy Case**

Several significant contributing factors have impacted the Debtors' financial condition. As indicated, the residual impact and challenges posed by the COVID-19 Pandemic have led to a detrimental impact on the Debtors' operations, including both an increase in cost and decrease in availability of medical supplies and automotive parts as well as an increased capital costs of obtaining new equipment and vehicles to meet increased "call-for service" demand. In addition to increased operating costs, the Debtors have also had to contend with fluctuating and generally diminishing reimbursement and collection rates on the receivables generated by the jobs that have been serviced.

As billing and collection of receivables in the medical industry is a generally complicated endeavor, the Debtors have historically outsourced the logistics of receivable collections to third-party billing companies. In or around October of 2021 the Debtors terminated the relationship with their longstanding third-party billing company. The Debtors' transition from that third-party billing provider to their current third-party billing provider stretched over a longer period of time than anticipated and had a significantly detrimental impact on the Debtors' operations, including a significant decline in the Debtors ability to fully realize on the receivables generated by their operations.

1.9.    **Significant Events During the Bankruptcy Case**

On June 27, 2024, Mark Politan was appointed the Subchapter V Trustee in the Debtors' Chapter 11 Bankruptcy Cases.

On August 9, 2024, the Court entered an order directing the Joint Administration of the Debtors' Chapter 11 Cases.

On August 13, 2024, Joseph Tomaino was appointed as the Patient Care Ombudsman.

Since filing the Chapter 11 Cases, the Debtors have undertaken a recalibration of their operations in an attempt to begin re-deploying their ambulances in response to calls from their municipal partners and other "call-for-service" partners. This recalibration has enabled the Debtors to begin servicing the ambulance calls received, as opposed to simply referring said calls to friendly competitors, which the Debtors have been doing on a post-petition basis to maintain their key municipal and "call-for-service" relationships. To that end, the Debtors have recently restarted their operations and are currently running one (1) unit on a daily twelve (12) hour shift.  Debtors anticipate increasing service commencing with the Effective Date of the Plan.

The Debtors have also filed a motion to sell two surplus ambulances for a total purchase price of $340,000.  After payment of the lien of the existing secured creditor and brokage commission, the Debtors expect to realize approximately $90,000.

Simultaneously, the Debtors have been exploring potential infusions of capital from third-parties, whether by a potential sale of the Debtors' operating assets or via post-petition debtor-in-possession financing. As further outlined below, these discussions have led to an agreement between NJMHC and Tri-State by which Tri-State will be providing NHMJC with staffing and management services which will enable NJMHC to further expand and redeploy its operations, thereby generating the increased revenue that will be utilized to fund the Plan as outlined herein.

The Debtors have also been exploring various options in connection with the sale of certain of their vehicles in an effort to raise additional post-petition working capital that will provide additional funding for the Debtors' operations under the Plan.

### 1.10.  Projected Recovery of Avoidable Transfers

The Debtors do not intend to pursue any preference, fraudulent conveyance, or other avoidance actions.

### ARTICLE 2

### THE PLAN

The Debtors' Plan must describe how their Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment.  For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired.  A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more

5

than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### 2.1. <u>Unclassified Claims</u>

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

A. Administrative Expenses

The Debtors must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1. If the Debtors trade in the ordinary course of business following filing of the Chapter 11 Cases, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtors after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtors and their trade Creditors.

2. If the Debtors received goods they had purchased in the ordinary course of business within 20 days before the Petition Dates, the value of the goods received is an Administrative Expense.

3. Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtors during the course of the Chapter 11 Cases. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtors' estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount | Proposed Treatment |
|---|---|---|
| Professional fees, as approved by the Bankruptcy Court.<br><br>**Klestadt Winters Jureller Southard & Stevens ("KWJSS").** | **Final amount to be determined.** | After Bankruptcy Court approval, Payment through the Plan as follows:<br><br>**Retainer of $25,000 currently held in trust to be paid immediately upon Court approval. Balance to be paid as an administrative expense through the confirmed Plan.** |
| Clerk's Office fees. | | Paid in full on the Effective Date. |
| Other Administrative Expenses.<br><br>**Joseph Tomaino, the Patient Care Ombudsman.** | **Final amount to be determined.** | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows:<br><br>**To be paid as an administrative expense through the confirmed Plan.** |
| Trustee<br><br>**Mark Politan, the Subchapter V Trustee.** | **Final amount to be determined.** | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows:<br><br>**$5,000 currently held in trust to be paid immediately upon Court approval. Balance to be paid as an administrative expense through the confirmed Plan.** |
| TOTAL | **Final amount to be determined.** | |

B.      Priority Tax Claims

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Employment Development Department – California | $4,511.31 | | Payment Interval = quarterly installments<br><br>Payment Begin Date = The quarter immediately after all Allowed Administrative Claims and All Allowed Claims in Classes 1(a)-(c), 2(a)-(b), 3, 5, and 6 are paid in full. |
| Pennsylvania Department of Revenue | Undetermined[2] | | Payment Interval = [•]<br><br>Payment Begin Date = [•] |
| State of Connecticut, Department of Revenue Services | Undetermined[3] | | Payment Interval = [•]<br><br>Payment Begin Date = [•] |

### 2.2    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

A.  Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code.  If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. In addition, certain claims secured only by the debtor's principal residence, may require different treatment pursuant to § 1190(3) of the Code as set forth below, if applicable.

---

[2] The Governmental Bar Date is currently December 17, 2024. The Debtors will propose treatment of this claim once the applicable deadline has passed.

[3] The Governmental Bar Date is currently December 17, 2024. The Debtors will propose treatment of this claim once the applicable deadline has passed.

The following chart lists all classes containing the Debtors' secured prepetition Claims and their proposed treatment under the Plan:

| Class # | Description | Insider (Yes or No)? | Impairment | Treatment |
|---|---|---|---|---|
| Class 1(a) | Secured Claim of Internal Revenue Service (the "IRS")<br><br>Total Scheduled Amount of IRS Claim = $2,427,236.00<br><br>Total Allowed Amount of IRS Claim = $2,424,581.00 | No | Unimpaired | IRS to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments in the sum of $2,424,581.00 over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which the IRS' claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. |
| Class 1(b) | Secured Claim of New Jersey Department of Treasury ("NJDT")<br><br>Total Scheduled Amount of NJDT Claim = $450,000.00<br><br>Total Allowed Amount of NJDT Claim = $581,301.89 | No | Unimpaired | NJDT to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments in the sum of $581,301.89 over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which the NJDT's claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. |

| Class # | Description | Insider (Yes or No)? | Impairment | Treatment |
|---|---|---|---|---|
| Class 1 (c) | Secured Claim of NJ Department of Labor, Div. of Employer Accounts ("NJDL")<br><br>Total Scheduled Amount of NJDL Claim = $0.00<br><br>Total Allowed Amount of NJDL Claim = $782,517.60 | No | Unimpaired | NJDL to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments in the sum of $782,517.60 over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which the NJDL's claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. |
| Class 2(a) | Secured Claim of U.S. Small Business Administration ("US SBA")<br><br>Total Scheduled Amount of US SBA's Claim = $150,000.00<br><br>Total Allowed Amount of US SBA's Claim = $215,004.54 | No | Unimpaired | US SBA to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments over a period of five (5) years, in the amount of $215,004.54, beginning on the later of: (x) the Effective Date, and (y) the date on which US SBA's claim becomes an Allowed Claim, or as soon thereafter as practicable, with the balance payable on the fifth anniversary of the Effective Date, to be paid from the disposable income from the Debtors' operations. after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. |

| Class # | Description | Insider (Yes or No)? | Impairment | Treatment |
|---|---|---|---|---|
| Class 2(b) | Secured Claim of STRATA Trust Company ("STRATA")<br><br>Total Scheduled Amount of STRATA Claim = $277,532.74<br><br>Total Allowed Amount of STRATA Claim = $324,327.37 | No | Unimpaired | STRATA to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments over a period of five (5) years in the amount of $324,327.37, beginning on the later of: (x) the Effective Date, and (y) the date on which STRATA's claim becomes an Allowed Claim, or as soon thereafter as practicable, with the balance payable on the fifth anniversary of the Effective Date, to be paid from the disposable income from the Debtors' operations after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. . |
| Class 3 | Secured Claim of Vivian Capital Group LLC ("Vivian")<br><br>Total Scheduled Amount of Vivian Claim = $55,774.14<br><br>Total Allowed Amount of Vivian Claim = $55,775.00 | No | Unimpaired | Vivian to receive Cash in an amount equal to the Allowed amount of its Secured Claim in quarterly installments in the sum of $55,775.00 over a period of five (5) years, beginning on the later of: (x) the Effective Date, and (y) the date on which the Vivian's claim becomes an Allowed Claim, or as soon thereafter as practicable, with the balance payable on the fifth anniversary of the Effective Date, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Classes 5 and 6. |

| Class # | Description | Insider (Yes or No)? | Impairment | Treatment |
|---|---|---|---|---|
| Class 4(a) | Secured Claim of De Lage Laden Financial Services, Inc. ("De Lang") | No | Unimpaired | De Lang will receive Cash in an amount equal to the Allowed amount of its Secured Claim on the later of (i) the Debtors' successful sale of the applicable collateral securing De Lang's Claim, such sale being subject to Bankruptcy Court approval, and (ii) within fifteen (15) Business Days after the date on which the Bankruptcy Court enters an order allowing such Claim, or upon such later date as the Debtors and De Lang otherwise agree in writing. |
| | Collateral Description = Two (2) Ford 2020 Type I Resue Ambulances | | | |
| | Total Allowed Amount of De Lang = $233,044.99 | | | |
| Class 4(b) | Secured Claim of United Leasing Inc ("United") | No | Unimpaired | United will receive Cash in an amount equal to the Allowed amount of its Secured Claim on the later of (i) the Debtors' successful sale of the applicable collateral securing United's Claim, such sale being subject to Bankruptcy Court approval, and (ii) within fifteen (15) Business Days after the date on which the Bankruptcy Court enters an order allowing such Claim, or upon such later date as the Debtors and United otherwise agree in writing. |
| | Collateral Description = Ford 2018 Type II Ambulance | | | |
| | Total Scheduled Amount of United = $30,000.00 | | | |
| | Total Allowed Amount of United = $34,179.38 | | | |

**B. Classes of Priority Unsecured Claims**

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

The following chart lists all classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|

| Class 5 | Priority unsecured claims pursuant to § 507(a)(4)<br><br>Total Amount of Claims = $47,622.94 | Impaired | Each holder of a Class 5 Claim to receive Cash in an amount equal to the Allowed amount of its Class 5 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each Class 5 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims. |

### C. Classes of General Unsecured Claims

General unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Classes 6 through 7, which contain general unsecured claims against the Debtors:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class 6 | General Unsecured Claims related to unpaid wages previously earned by current and former employees | Impaired | Each holder of a Class 6 Claim to receive Cash in an amount equal to the Allowed amount of its Class 6 Claim in quarterly installments over a period of three (3) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of: (x) the Effective Date, and (y) the date on which each Class 6 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations, after payment in full of all Allowed Administrative Claims and all Allowed Claims in Class 5. |
| Class 7 | All other General Unsecured Claims against the Debtors | Impaired | Each holder of a Class 7 Claim shall receive a pro rata share based on the Allowed amount if its Class 7 Claim in quarterly installments over a period of three (3) years, or such other time not |

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| | | | to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of (x) the Effective Date and (y) the date on which each Class 7 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtors' operations available after payment in full of all Allowed Claims in Classes 1(a)-(c), 2(a)-(b), 3, 4(a)-(b), 5, and 6, Priority Tax Claims, and other costs of administration, including all Allowed Administrative Claims. The Debtors project that pro rata distributions to holders of Allowed Class 7 Claims will total approximately 10-100% of each holder's respective Allowed Claim. |

### D. Class of Equity Interest Holders

Equity Interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtors. In a corporation, entities holding preferred or common stock are Equity Interest holders. In a partnership, Equity Interest holders include both general and limited partners. In a limited liability company ("LLC"), the Equity Interest holders are the members. Finally, with respect to an individual who is a debtor, the debtor is the Equity Interest holder.

The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class 8 | Equity Interest Holders | Impaired | Will retain interest but will not receive any payment. |

### 2.3    Estimated Number and Amount of Claims Objections

The Debtors may object to the amount or validity of any Claim within 60 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim

under the Plan.  If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

The Debtors are currently in the process of reviewing the claims filed in these Chapter 11 Cases and reconciling the amounts contained therein as against their respective books and records. Once said review has been completed, the Debtors will make a final determination as to whether they will be objecting to certain of their Creditors' filed claims.

### 2.4     Treatment of Executory Contracts and Unexpired Leases

Executory Contracts are contracts where significant performance of the contract remains for both the Debtors and another party to the contract.  The Debtors have the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval.  The paragraphs below explain the Debtors' intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

[X] Assumption of Executory Contracts.

The Executory Contracts shown on **Exhibit "B"** shall be assumed by NJMHC. Assumption means that NJMHC has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Executory Contracts not explicitly included in **Exhibit "B"** are deemed rejected. Parties to rejected Executory Contracts shall have until thirty (30) days after the entry of an order confirming this Plan to file a claim for any rejection damages.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

### 2.5     Means for Implementation of the Plan

The Debtors have reached an agreement with Tri-State Medical ("Tri-State") whereby Tri-State will be providing staffing and management services to the Debtors. Specifically, Tri-State will be the entity which will house employees and fund the operating expenses related to said employees, including, but not limited to, employee payroll. Tri-State will fund these employee-related operating expenses and then issue monthly invoices to the Debtors which will be payable on sixty (60) day terms. The Debtors anticipate that through this arrangement with Tri-State, they will be able to recall approximately thirty (30) employees and increase operations from one (1) unit operating a daily twelve (12) hour shift to two (2) units operating daily twenty-four (24) hour shifts. Such increased operations will enable the Debtors to recapture the jobs being called in by their municipal and "call for service" partners thereby significantly increasing revenue generated.

15

This increased revenue will be utilized to fund the payments outlined under the Plan. A copy of the agreement with Tri-State is attached hereto as **Exhibit "D"**.

On Confirmation of the Plan, all property of the Debtors, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equitable Interests except as provided in the Plan, to the Debtors. The Debtors expect to have sufficient cash on hand to make the payments required on the Effective Date.

The respective Mangers of the Debtors immediately prior to the Effective Date shall serve as the initial Managers of the Reorganized Debtors on and after the Effective Date. Each Manager shall serve in accordance with applicable non-bankruptcy law and the Debtors' respective operating agreements, as each of the same may be amended from time to time.

### 2.6    Substantive Consolidation for Plan Distribution Purposes Only

On the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be treated as if merged into and with the Assets and liabilities of the other Debtors, (b) no Distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (c) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished so that any Claim against any Debtor and guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed against any Debtor shall be filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of the other Debtors. As indicated, such substantive consolidation shall not (other than for Plan distribution purposes) affect the legal and corporate structures of the Debtors. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan distribution purposes only.

### 2.7    Payments

If the Plan is confirmed under §1191(a), payments to Creditors provided for in the Plan will be made by the Trustee pursuant to §1194(a). Once the Trustee's service is terminated under § 1183(c), the Debtors shall make Plan payments except as otherwise provided in the Plan or in the order confirming the Plan.

If the Plan is confirmed under section § 1191(b), except as otherwise provided in the Plan or in the order confirming the Plan, the Trustee shall make all Plan payments to creditors under the Plan.

### 2.8    Post-Confirmation Management

16

The Post-Confirmation Managers of the Debtors, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| Louis V. Greco, III | Manager of each of the Debtors | $54,275.00[4] |

### 2.9    Tax Consequences of the Plan

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

The following are the anticipated tax consequences of the Plan: ***Creditors should consult their own accountants, attorneys, and/or financial advisors regarding any tax consequences resulting from the discharge of any or all money owed to them by the Debtors***.

### 2.10    Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan

Debtors have provided projected financial information. Those projections are listed in **Exhibit "A"**.

### ARTICLE 3
### FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.

### 3.1.    Ability to Initially Fund Plan

The Debtors believe that they will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash, are attached hereto as **Exhibit "A"**.

### 3.2.    Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtors must submit all or such portion of the future earnings or other future income of the Debtors to the supervision and control of the Trustee as is necessary for the execution of the Plan.

---

[4] Mr. Greco's salary increases to $82,875.00 three years after the Effective Date; it increases to $85,361.00 four years after the Effective Date; and it increases to $87,725.00 five years after the Effective Date.

The Debtors have provided projected financial information. Those projections are listed in **Exhibit "A"** (referenced in § 2.10, above).

The Debtors' financial projections show that the Debtors will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes sufficient to pay creditors' claims over the life of the Plan. The final Plan payment is expected to be paid in 2029.

*You Should Consult with Your own Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

### ARTICLE 4
### LIQUIDATION ANALYSIS.

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit "C"**.

### ARTICLE 5
### DISCHARGE

Discharge. **If the Plan is confirmed under § 1191(a)**, on the Confirmation Date of this Plan, the Debtors will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b)**, as soon as practicable after completion by the Debtors of all payments due under the Plan, unless the court approves a written waiver of discharge executed by the Debtors after the order for relief under this chapter, the court shall grant the Debtors a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt —

(1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or

(2) if applicable, of the kind specified in section 523(a) of this title.

### ARTICLE 6
### GENERAL PROVISIONS

**6.1.**   **Title to Assets**

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtors, and (ii) after confirmation  of the Plan, the property dealt with by the Plan is free and

clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtors.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtors acquires, as well as earnings from services performed by the Debtors, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtors shall remain in possession of all property of the estate.

### 6.2.    **Binding Effect**

If the Plan is confirmed, the provisions of the Plan will bind the Debtors and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 6.3.    **Severability**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4.    **Retention of Jurisdiction by the Bankruptcy Court**

The Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear  and  allow  all applications  for  compensation  to professionals  and  other Administrative Expenses; (iv) to  resolve  all  issues  regarding Claims  objections,  and issues arising  from  the assumption/rejection of executory contracts or unexpired leases, and (v)  to adjudicate any  cause of action which may exist in favor of the Debtors, including preference and fraudulent transfer causes of action.

### 6.5.    **Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 6.6.    **Modification of Plan**.

The Debtors may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtors may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtors may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.7.    **Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtors, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.


## ARTICLE 7
## ATTACHMENTS

The following documents accompany the Plan:

[X]    Debtors' Consolidated Assets at Fair Market Value, included in the projections annexed as **Exhibit "A"**.

[X]    Debtors' Consolidated Liabilities, included in the projections annexed as **Exhibit "A"**.

[X]    Financial forecast for the Debtors, included in the projections annexed as **Exhibit "A"**.

[X]    Tables showing the amount of cash on hand as of the Effective Date, and the sources of that cash, information included in the projections annexed as **Exhibit "A"** .

[X]    Executory Contracts and Unexpired Leases, to be Assumed annexed as **Exhibit "B"**.

[X]    Liquidation Analysis, annexed as **Exhibit "C"**

[X]    TriState Employment Agreement, annexed as **Exhibit "D"**

## ARTICLE 8
## FREQUENTLY ASKED QUESTIONS

**What Is the DEBTOR Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

How Do I Determine Which Class I Am In? To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. Article 2 lists all classes of claimants and their types of claims.

**Why Is Confirmation of a Plan of Reorganization Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPARIED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Article 2 of the Plan identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When is the Deadline by Which I Need to Return My Ballot?** The Plan distributed to all claim holders for their review, consideration and approval. The deadline by which ballots must be returned is December 10, 2024. Ballots should be mailed to the following address: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Tracy L. Klestadt & Andrew C. Brown.

**How do I Determine When and How Much I Will be Paid?** In Article 2, the Debtors have provided both written and financial summaries of what they anticipate each class of creditors will receive under the Plan.

### ARTICLE 9
### DEFINITIONS

**9.1.** The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code.

**9.2. Administrative Claimant**: Any person entitled to payment of an Administration Expense.

**9.3. Administrative Convenience Class**: A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**9.4. Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**9.5 Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**9.6. Allowed Claim**: Any claim against the Debtors pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtors, and (b) as to which either (i) a party in interest, including the Debtors, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.7. Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets,

credits, or refunds to which the Debtors or Debtors-in-Possession shall be entitled on the Confirmation Date.

**9.8.    Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code

**9.9.    Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtors or Debtors-in-Possession shall be entitled on the Confirmation Date.

**9.10.   Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.11.    Bankruptcy Court**: The United States Bankruptcy Court for the District of New Jersey.

**9.12.    Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure.

**9.13.   Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.14.    Chapter 11 Cases**: The jointly-administered cases under Chapter 11 of the Bankruptcy Code filed by the Debtors and Debtors-in-Possession currently pending before the Bankruptcy Court.

**9.15   Claim**: Any "right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.16.   Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.17.    Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**9.18.    Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**9.19.    Confirmation Hearing**: The hearing to be held on [•] to consider confirmation of the Plan.

**9.20.    Confirmation Order**:  An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**9.21.    Creditor**: Any person who has a Claim against the Debtors that arose on or before the Petition Date.

**9.22.    Debtors and Debtors-in-Possession**: NJMHC, Lime Line, and SSME, the debtors-in-possession in these Chapter 11 Cases.

**9.23.    Disputed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code that the Debtors have in any way objected to, challenged or otherwise disputed.

**9.24.    Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

**9.25.    Effective Date**: Pursuant to D.N.J. LBR 3020-1, the effective date of a Chapter 11 plan is 30 days after entry of the order confirming the plan unless the plan or confirmation order provides otherwise.

**9.26.    Equity Interest**: An ownership interest in the Debtors.

**9.27.    Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

**9.28.    Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**9.29.    IRC**: The Internal Revenue Code.

**9.30.    Petition Date**: June 20, 2024, the date the Debtors filed their Chapter 11 petitions for relief.

**9.31.    Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**9.32.    Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**9.33.    Reorganized Debtors**: The Debtors after the Effective Date.

**9.34.   Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtors with the Bankruptcy Court listing liabilities and assets.

**9.35.   Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtors.

**9.36.   Trustee**: Mark Politan, the subchapter V trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**9.37.   Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 case which is not a secured Claim.

Dated:   New York, New York
         November 15, 2024

                              **KLESTADT WINTERS JURELLER**
                              **SOUTHARD & STEVENS, LLP**


                    By:   */s/ Tracy L. Klestadt*
                          Tracy L. Klestadt
                          Andrew C. Brown (admitted *pro hac vice*)
                          200 West 41st Street, 17th Floor
                          New York, New York 10036
                          Tel: (212) 972-3000
                          Fax: (212) 972-2245
                          Email: tklestadt@klestadt.com
                                 abrown@klestadt.com

                          *Attorneys for the Debtors and*
                          *Debtors-in-Possession*

# <u>Exhibit A</u>

| NJMHC | | Y1 Q1 | Y1 Q2 | Y1 Q3 | Y1 Q4 | Year 1 |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| **Transportation Revenue** | Memo Only | *442,654* | *742,517* | *901,628* | *901,628* | *2,988,427* |
| | | | | | | |
| Anticipated Collectible 1 | | 154,011 | 352,900 | 432,455 | 450,814 | *1,390,179* |
| Anticipated Collectible 2 | | 62,216 | 301,903 | 401,857 | 450,814 | *1,216,790* |
| **Total Anticipated Collections** | | 216,227 | 654,802 | 834,312 | 901,628 | *2,606,969* |
| | | | | | | |
| Staffing Expense | | 69,300 | 352,800 | 447,300 | 491,400 | 1,360,800 |
| Medical Billing | | 10,811 | 32,740 | 41,716 | 45,081 | 130,348 |
| Uniforms | | 7,370 | 2,948 | 2,527 | 2,527 | 15,372 |
| Medical Supplies | | 4,654 | 7,756 | 9,308 | 9,308 | 31,025 |
| Fuel | | 16,425 | 27,375 | 32,850 | 32,850 | 109,500 |
| Tolls | | 2,738 | 4,563 | 6,692 | 5,475 | 19,467 |
| Mechanical Repairs | | 17,769 | 21,000 | 42,000 | 42,000 | 122,769 |
| Communications | | 1,800 | 1,200 | 2,700 | 2,700 | 8,100 |
| **Total COGS** | - | 130,867 | 450,382 | 584,792 | 631,341 | 1,797,381 |
| | | | | | | |
| **Gross Profit** | | 85,360 | 204,420 | 249,520 | 270,287 | 809,588 |
| **Gross Profit Margin** | | 39% | 31% | 30% | 30% | 31% |
| | | | | | | - |
| Fixed Salary | | 54,275 | 54,275 | 54,275 | 54,275 | 217,100 |
| Rent / Lease | | 12,375 | 12,375 | 12,375 | 12,375 | 49,500 |
| Insurance | | 18,000 | 18,000 | 18,000 | 18,000 | 72,000 |
| **Total Expenses** | - | 84,650 | 84,650 | 84,650 | 84,650 | 338,600 |
| | | | | | | |
| **EBITDA** | | 710 | 119,770 | 164,870 | 185,637 | 470,988 |
| | | | | | | |
| **EBITDA Percentage** | | | | | | 2 |
| | | | | | | - |
| Payroll Taxes - Back Pay | | - | 11,255 | 15,217 | 17,162 | 43,634 |
| **Total Int., Taxes, Dep., and Amort.** | | - | 11,255 | 15,217 | 17,162 | 43,634 |
| | | | | | | |
| **Net Profit** | | 710 | 108,515 | 149,653 | 168,475 | 427,353 |
| **Net Profit Percentage** | | 0.3% | 17% | 18% | 19% | 16% |
| | | | | | | |
| **Funding** | | | | | | - |
| Initial Funding | - | | | - | | - |
| NJMHC Vehicle Sale | 340,000 | 63,000 | - | - | - | 63,000 |
| **Funding Total** | 340,000 | 63,000 | - | - | - | 63,000 |
| | | | | | | - |
| **Cash Before Capital Expenses** | 340,000 | 129,665 | 177,335 | 230,713 | 242,352 | 242,352 |
| | | | | | | |
| Klestadt | | 20,000 | 30,000 | 30,000 | 30,000 | 110,000 |
| Trustee | | 1,667 | 2,500 | 2,500 | 2,500 | 9,167 |
| Ombudsman | | 5,000 | 7,500 | 2,500 | 2,500 | 17,500 |
| Accountant | | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 |
| Miscellaneous | | 7,500 | 7,500 | 7,500 | 7,500 | 22,500 |
| Employee Back Pay | | - | 56,274 | 76,086 | 85,810 | 218,171 |
| Federal Tax Repayment | | - | - | 24,246 | 24,246 | 48,492 |
| State Tax Repayment | | - | - | - | - | - |
| SBA | | - | - | - | - | - |
| Strata | | - | - | 18,018 | 18,018 | 36,036 |
| Vivian Capital | | - | - | 3,486 | 3,486 | 6,972 |
| Vehicle Lease Pay Off & Broker | *250,045* | 34,179 | - | - | - | 34,179 |
| Other Secured Creditors | | | | | | |
| Unsecured Creditors | | - | - | - | - | - |
| Current - Operations | 24,000 | - | - | - | - | - |
| **Exit Expenses Total** | 274,045 | 74,596 | 110,024 | 170,586 | 180,310 | 528,017 |
| | | | | | | |
| **Ending Cash** | 65,955 | 68,819 | 81,060 | 73,877 | 69,542 | 69,542 |

| NJMHC | Y2 Q1 | Y2 Q2 | Y2 Q3 | Y2 Q4 | Year 2 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| **Transportation Revenue** | 1,060,739 | 1,193,331 | 1,352,442 | 1,352,442 | 4,958,953 |
| | | | | | - |
| Anticipated Collectible 1 | 512,010 | 581,366 | 657,862 | 676,221 | 2,427,459 |
| Anticipated Collectible 2 | 481,412 | 555,868 | 627,264 | 676,221 | 2,340,764 |
| **Total Anticipated Collections** | 993,422 | 1,137,234 | 1,285,126 | 1,352,442 | 4,768,224 |
| | | | | | - |
| Staffing Expense | 529,515 | 622,944 | 707,301 | 759,213 | 2,618,973 |
| Medical Billing | 49,671 | 56,862 | 64,256 | 67,622 | 238,411 |
| Uniforms | 2,527 | 2,527 | 2,527 | 2,527 | 10,108 |
| Medical Supplies | 11,455 | 13,007 | 13,961 | 13,961 | 52,385 |
| Fuel | 38,325 | 43,800 | 49,275 | 49,275 | 180,675 |
| Tolls | 6,083 | 6,996 | 7,908 | 8,213 | 29,200 |
| Mechanical Repairs | 42,000 | 42,000 | 38,769 | 42,000 | 164,769 |
| Communications | 2,700 | 2,700 | 5,931 | 2,700 | 14,031 |
| **Total COGS** | 682,277 | 790,835 | 889,929 | 945,511 | 3,308,551 |
| | | | | | - |
| **Gross Profit** | 311,146 | 346,399 | 395,197 | 406,931 | 1,459,672 |
| **Gross Profit Margin** | 31% | 30% | 31% | 30% | 31% |
| | | | | | - |
| Fixed Salary | 54,275 | 54,275 | 54,275 | 54,275 | 217,100 |
| Rent / Lease | 12,375 | 12,750 | 12,750 | 12,000 | 49,875 |
| Insurance | 22,000 | 24,000 | 24,000 | 24,000 | 94,000 |
| **Total Expenses** | 88,650 | 91,025 | 91,025 | 90,275 | 360,975 |
| **EBITDA** | 222,496 | 255,374 | 304,172 | 316,656 | 1,098,697 |
| **EBITDA Percentage** | | | | | - |
| Payroll Taxes - Back Pay | 16,450 | 13,931 | 30,810 | 29,616 | 90,806 |
| **Total Int., Taxes, Dep., and Amort.** | 16,450 | 13,931 | 30,810 | 29,616 | 90,806 |
| **Net Profit** | 206,045 | 241,443 | 273,362 | 287,040 | 1,007,891 |
| **Net Profit Percentage** | 21% | 21% | 21% | 21% | 21% |
| **Funding** | | | | | |
| Initial Funding | | | | | |
| NJMHC Vehicle Sale | - | - | - | - | - |
| **Funding Total** | - | - | - | - | - |
| **Cash Before Capital Expenses** | 275,587 | 98,238 | 366,974 | 146,690 | 146,690 |
| Klestadt | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 |
| Trustee | 2,500 | 2,500 | 2,500 | 833 | 8,333 |
| Ombudsman | 2,500 | - | - | - | 2,500 |
| Accountant | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 |
| Miscellaneous | - | - | - | - | - |
| Employee Back Pay | 82,252 | 69,653 | 154,049 | 148,078 | 454,031 |
| Federal Tax Repayment | 74,253 | 74,253 | 74,253 | 74,253 | 297,011 |
| State Tax Repayment | - | - | - | - | - |
| SBA | - | - | - | - | - |
| Strata | 18,018 | 18,018 | 18,018 | 18,018 | 72,073 |
| Vivian Capital | 3,486 | 3,486 | 3,486 | 3,486 | 13,944 |
| Vehicle Lease Pay Off & Broker | | | | | |
| Other Secured Creditors | | | | | |
| Unsecured Creditors | - | - | - | - | - |
| Current - Operations | - | - | - | - | - |
| **Exit Expenses Total** | 219,258 | 204,160 | 288,556 | 280,918 | 992,893 |
| **Ending Cash** | 56,329 | 93,612 | 128,418 | 134,541 | 134,541 |

| NJMHC | Y3 Q1 | Y3 Q2 | Y3 Q3 | Y3 Q4 | Year 3 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| **Transportation Revenue** | 1,587,130 | 1,587,130 | 1,587,130 | 1,587,130 | 6,348,520 |
| | | | | | - |
| Anticipated Collectible 1 | 766,486 | 793,565 | 793,565 | 793,565 | 3,147,181 |
| Anticipated Collectible 2 | 721,353 | 793,565 | 793,565 | 793,565 | 3,102,048 |
| **Total Anticipated Collections** | 1,487,839 | 1,587,130 | 1,587,130 | 1,587,130 | 6,249,229 |
| | | | | | - |
| Staffing Expense | 801,392 | 868,877 | 868,877 | 868,877 | 3,408,023 |
| Medical Billing | 74,392 | 79,357 | 79,357 | 79,357 | 312,461 |
| Uniforms | 884 | 884 | 884 | 884 | 3,538 |
| Medical Supplies | 15,513 | 15,513 | 15,513 | 15,513 | 62,050 |
| Fuel | 54,750 | 54,750 | 54,750 | 54,750 | 219,000 |
| Tolls | 9,125 | 9,125 | 9,125 | 9,125 | 36,500 |
| Mechanical Repairs | 48,000 | 48,000 | 48,000 | 48,000 | 192,000 |
| Communications | 3,150 | 3,150 | 3,150 | 3,150 | 12,600 |
| **Total COGS** | 1,007,205 | 1,079,656 | 1,079,656 | 1,079,656 | 4,246,172 |
| | | | | | - |
| **Gross Profit** | 480,633 | 507,475 | 507,475 | 507,475 | 2,003,057 |
| **Gross Profit Margin** | 32% | 32% | 32% | 32% | 32% |
| | | | | | - |
| Fixed Salary | 82,875 | 82,875 | 82,875 | 82,875 | 331,500 |
| Rent / Lease | - | - | - | 4,250 | 4,250 |
| Insurance | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 |
| **Total Expenses** | 112,875 | 112,875 | 112,875 | 117,125 | 455,750 |
| **EBITDA** | 367,758 | 394,600 | 394,600 | 390,350 | 1,547,307 |
| **EBITDA Percentage** | | | | | - |
| Payroll Taxes - Back Pay | 44,351 | 59,127 | - | - | 103,478 |
| **Total Int., Taxes, Dep., and Amort.** | 44,351 | 59,127 | - | - | 103,478 |
| **Net Profit** | 323,408 | 335,472 | 394,600 | 390,350 | 1,443,829 |
| **Net Profit Percentage** | 22% | 21% | 25% | 25% | 23% |
| **Funding** | | | | | |
| Initial Funding | | | | | |
| NJMHC Vehicle Sale | - | - | - | - | |
| **Funding Total** | - | - | - | - | |
| **Cash Before Capital Expenses** | 457,948 | 514,011 | 570,094 | 691,368 | 1,578,370 |
| Klestadt | - | - | - | - | - |
| Trustee | - | - | - | - | - |
| Ombudsman | - | - | - | - | - |
| Accountant | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 |
| Miscellaneous | | | | | |
| Employee Back Pay | 221,753 | 295,637 | | | 517,390 |
| Federal Tax Repayment | 74,253 | 74,253 | 241,322 | 241,322 | 631,149 |
| State Tax Repayment | - | - | - | 171,041 | 171,041 |
| SBA | - | - | - | - | - |
| Strata | 18,018 | 18,018 | 18,018 | 18,018 | 72,073 |
| Vivian Capital | 3,486 | 3,486 | 3,486 | 3,486 | 13,944 |
| Vehicle Lease Pay Off & Broker | - | - | - | - | - |
| Other Secured Creditors | | | | | |
| Unsecured Creditors | - | - | - | - | - |
| Current - Operations | - | - | - | - | - |
| **Exit Expenses Total** | 323,760 | 397,644 | 269,076 | 440,117 | 1,430,597 |
| **Ending Cash** | 134,188 | 116,367 | 301,018 | 251,251 | 251,251 |

| NJMHC | Y4 Q1 | Y4 Q2 | Y4 Q3 | Y4 Q4 | Year 4 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| **Transportation Revenue** | 1,841,906 | 1,841,906 | 1,841,906 | 1,841,906 | 7,367,625 |
| | | | | | - |
| Anticipated Collectible 1 | 891,556 | 920,953 | 920,953 | 920,953 | 3,654,415 |
| Anticipated Collectible 2 | 842,560 | 920,953 | 920,953 | 920,953 | 3,605,420 |
| **Total Anticipated Collections** | 1,734,116 | 1,841,906 | 1,841,906 | 1,841,906 | 7,259,835 |
| | | | | | - |
| Staffing Expense | 876,898 | 894,943 | 894,943 | 894,943 | 3,561,728 |
| Medical Billing | 86,706 | 92,095 | 92,095 | 92,095 | 362,992 |
| Uniforms | 1,150 | 1,150 | 1,150 | 1,150 | 4,599 |
| Medical Supplies | 23,269 | 23,269 | 23,269 | 23,269 | 93,075 |
| Fuel | 82,125 | 82,125 | 82,125 | 82,125 | 328,500 |
| Tolls | 9,125 | 9,125 | 9,125 | 9,125 | 36,500 |
| Mechanical Repairs | 72,000 | 72,000 | 72,000 | 72,000 | 288,000 |
| Communications | 4,095 | 4,095 | 4,095 | 4,095 | 16,380 |
| **Total COGS** | 1,155,367 | 1,178,802 | 1,178,802 | 1,178,802 | 4,691,773 |
| | | | | | - |
| **Gross Profit** | 578,749 | 663,104 | 663,104 | 663,104 | 2,568,061 |
| **Gross Profit Margin** | 33% | 36% | 36% | 36% | 35% |
| | | | | | - |
| Fixed Salary | 85,361 | 85,361 | 85,361 | 85,361 | 341,445 |
| Rent / Lease | 13,125 | 13,125 | 13,125 | 13,125 | 52,500 |
| Insurance | 39,000 | 39,000 | 39,000 | 39,000 | 156,000 |
| **Total Expenses** | 137,486 | 137,486 | 137,486 | 137,486 | 549,945 |
| | | | | | |
| **EBITDA** | 441,263 | 525,618 | 525,618 | 525,618 | 2,018,116 |
| | | | | | |
| **EBITDA Percentage** | | | | | - |
| | | | | | |
| Payroll Taxes - Back Pay | - | - | - | - | - |
| **Total Int., Taxes, Dep., and Amort.** | - | - | - | - | - |
| | | | | | |
| **Net Profit** | 441,263 | 525,618 | 525,618 | 525,618 | 2,018,116 |
| **Net Profit Percentage** | 25% | 29% | 29% | 29% | 28% |
| | | | | | |
| **Funding** | | | | | |
| Initial Funding | | | | | |
| NJMHC Vehicle Sale | - | - | - | - | |
| **Funding Total** | - | - | - | - | |
| | | | | | |
| **Cash Before Capital Expenses** | 692,514 | 778,015 | 863,515 | 955,266 | 2,269,367 |
| | | | | | |
| Klestadt | - | - | - | - | - |
| Trustee | - | - | - | - | - |
| Ombudsman | - | - | - | - | - |
| Accountant | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 |
| Miscellaneous | - | | | | |
| Employee Back Pay | - | - | - | - | - |
| Federal Tax Repayment | 241,322 | 241,322 | 241,322 | 241,322 | 965,286 |
| State Tax Repayment | 171,041 | 171,041 | 171,041 | 171,041 | 684,165 |
| SBA | - | - | - | - | - |
| Strata | 18,018 | 18,018 | 18,018 | 18,018 | 72,073 |
| Vivian Capital | 3,486 | 3,486 | 3,486 | 3,486 | 13,944 |
| Vehicle Lease Pay Off & Broker | - | - | - | - | - |
| Other Secured Creditors | | | | | |
| Unsecured Creditors | - | - | - | - | - |
| Current - Operations | - | - | - | - | - |
| **Exit Expenses Total** | 440,117 | 440,117 | 440,117 | 440,117 | 1,760,468 |
| | | | | | |
| **Ending Cash** | 252,397 | 337,897 | 429,648 | 521,399 | 521,399 |

| NJMHC | Y5 Q1 | Y5 Q2 | Y5 Q3 | Y5 Q4 | Year 5 | TOTALS |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| **Transportation Revenue** | **1,925,231** | **1,925,231** | **1,925,231** | **1,925,231** | **7,700,922** | **29,364,447** |
| | | | | | | |
| Anticipated Collectible 1 | 953,001 | 962,615 | 962,615 | 962,615 | 3,840,847 | 14,460,082 |
| Anticipated Collectible 2 | 936,977 | 962,615 | 962,615 | 962,615 | 3,824,823 | 14,089,845 |
| **Total Anticipated Collections** | **1,889,978** | **1,925,231** | **1,925,231** | **1,925,231** | **7,665,670** | **28,549,926** |
| | | | | | | |
| Staffing Expense | 905,270 | 921,792 | 921,792 | 921,792 | 3,670,645 | 14,620,168 |
| Medical Billing | 94,499 | 96,262 | 96,262 | 96,262 | 383,283 | 1,427,496 |
| Uniforms | 1,495 | 1,495 | 1,495 | 1,495 | 5,979 | 39,595 |
| Medical Supplies | 29,712 | 30,249 | 30,249 | 30,249 | 120,461 | 358,995 |
| Fuel | 104,867 | 106,763 | 106,763 | 106,763 | 425,155 | 1,262,830 |
| Tolls | 15,421 | 15,421 | 15,421 | 15,421 | 61,685 | 183,352 |
| Mechanical Repairs | 91,938 | 93,600 | 93,600 | 93,600 | 372,738 | 1,140,277 |
| Communications | 5,324 | 5,324 | 5,324 | 5,324 | 21,294 | 72,405 |
| **Total COGS** | **1,248,526** | **1,270,905** | **1,270,905** | **1,270,905** | **5,061,240** | **19,105,118** |
| | | | | | | |
| **Gross Profit** | **641,452** | **654,326** | **654,326** | **654,326** | **2,604,430** | **9,444,808** |
| **Gross Profit Margin** | **34%** | **34%** | **34%** | **34%** | **34%** | |
| | | | | | | |
| Fixed Salary | 87,725 | 87,922 | 87,922 | 87,922 | 351,491 | 1,458,636 |
| Rent / Lease | 13,500 | 13,500 | 13,500 | 13,500 | 54,000 | 210,125 |
| Insurance | 50,700 | 50,700 | 50,700 | 50,700 | 202,800 | 644,800 |
| **Total Expenses** | **151,925** | **152,122** | **152,122** | **152,122** | **608,291** | **2,313,561** |
| | | | | | | |
| **EBITDA** | **489,527** | **502,204** | **502,204** | **502,204** | **1,996,138** | **7,131,247** |
| | | | | | | |
| **EBITDA Percentage** | | | | | **-** | |
| | | | | | | |
| Payroll Taxes - Back Pay | - | - | - | - | - | 237,918 |
| **Total Int., Taxes, Dep., and Amort.** | **-** | **-** | **-** | **-** | **-** | **237,918** |
| | | | | | | |
| **Net Profit** | **489,527** | **502,204** | **502,204** | **502,204** | **1,996,138** | **6,893,328** |
| **Net Profit Percentage** | **26%** | **26%** | **26%** | **26%** | **26%** | |
| | | | | | | |
| **Funding** | | | | | | |
| Initial Funding | | | | | | |
| NJMHC Vehicle Sale | - | - | - | - | | 63,000 |
| **Funding Total** | **-** | **-** | **-** | **-** | | **63,000** |
| | | | | | | |
| **Cash Before Capital Expenses** | **1,010,925** | **1,007,594** | **1,004,263** | **1,245,739** | **2,517,537** | **6,754,316** |
| | | | | | | |
| Klestadt | - | - | - | - | - | 230,000 |
| Trustee | - | - | - | - | - | 17,500 |
| Ombudsman | - | - | - | - | - | 20,000 |
| Accountant | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 | 125,000 |
| Miscellaneous | | | | | | 22,500 |
| Employee Back Pay | - | - | - | - | - | 1,189,592 |
| Federal Tax Repayment | 241,322 | 241,322 | - | - | 482,643 | 2,424,581 |
| State Tax Repayment | 171,041 | 171,041 | 171,041 | - | 513,124 | 1,368,331 |
| SBA | 71,668 | 71,668 | 71,668 | - | 215,005 | 215,005 |
| Strata | 18,018 | 18,018 | 18,018 | 18,018 | 72,073 | 324,327 |
| Vivian Capital | 3,486 | 3,486 | - | - | 6,972 | 55,775 |
| Vehicle Lease Pay Off & Broker | - | - | - | - | | 34,179 |
| Other Secured Creditors | | - | - | - | - | - |
| Unsecured Creditors | - | - | - | 645,616 | 645,616 | 645,616 |
| Current - Operations | - | - | - | - | - | |
| **Exit Expenses Total** | **511,785** | **511,785** | **266,978** | **669,884** | **1,960,432** | **6,672,407** |
| | | | | | | |
| **Ending Cash** | **499,140** | **495,809** | **737,285** | **575,855** | **557,105** | |

# **<u>Exhibit B</u>**

**EXHIBIT "B"**

**ASSUMPTION OF EXECUTORY CONTRACTS**

1.    Emergency and non-emergency services agreement with Bergen New Bridge Medical Center.

2.    Emergency and non-emergency services agreement with Christian HealthCare Center.

3.    Emergency and non-emergency services agreement with Saint Michaels Medical Center.

4.    Real Estate Lease Agreement with Zohar Zisapel Properties, Inc.

# **<u>Exhibit C</u>**

**NJ Mobile HealthCare Liquidation Analysis**

| Item # | Description | Liquidation Value |
|---|---|---|
| 1 | Miscellaneous office furniture | 2,500.00 |
| 2 | Office equipment including all computer equipment, communications systems equipment, software, phones EMS communications Equipment | 10,000.00 |
| 3 | Misc. Basic life support and ambulance equipment contained in each ambulance | 85,000.00 |
| 4 | Ford 2013 Type II Ambulance. Vehicle ID 49-40 | 2,500.00 |
| 5 | Ford 2012 Type II Ambulance. Vehicle ID 49-41 | 2,500.00 |
| 6 | Ford 2014 Type II Ambulance. Vehicle ID 49-42 | 14,000.00 |
| 7 | Ford 2007 Supervisor Vehicle. Vehicle ID 55-12 | 1,000.00 |
| 8 | Chevy 2009 Type III Ambulance. Vehicle ID 55-56. | 15,000.00 |
| 9 | Ford 2014 Type III Ambulance. Vehicle ID 55-50 | 5,000.00 |
| 10 | Chevy 2013 Type I Ambulance. Vehicle ID 55-53. | 18,000.00 |
| 11 | International 1994 Mobile Command Bus Vehicle ID 56-GC | 5,000.00 |
| 12 | Gulf Cart Vehicle ID 56-GC | 5,000.00 |
| 13 | Flatbed Golf Cart Trailer. Vehicle ID 56-GCT | 700.00 |
| 14 | Diamond Cargo Trailer. Vehicle ID 56-MCRU | 1,500.00 |

# **<u>Exhibit D</u>**

## SUPPLEMENTAL STAFFING AGREEMENT

This Supplemental Staffing Agreement (hereinafter "Agreement") is entered into on **September 15, 2024**, by and between **Tri-State Medical Holdings LLC** (hereinafter "Agency") and **NJ Mobile HealthCare, LLC**. (hereinafter "Client").

**WHEREAS**, Agency is in the business of recruiting qualified personnel to service as Registered Nurses (specifically, Mobile Intensive Care Nurses / Specialty Care Transport Nurses), Paramedics, Advanced Emergency Medical Technicians, Emergency Medical Technicians, Emergency Medical Responders, Motor Vehicle Operators, other ancillary, healthcare and/or EMS support staff (hereinafter called "personnel") to provide quality patient care to Client; and

**WHEREAS**, Client may be in need of qualified permanent and temporary staff for its medical transportation or patient care purposes;

**THEREFORE**, in consideration of the mutual promises and covenants in this agreement, Agency and Client do hereby agree as follows:

1. TERM:  The term of this agreement shall be for a period of one year, commencing on **September 15, 2024** and may be extended for additional one-year periods by mutual agreement.  Either party may terminate this agreement at any time, without cause, by giving thirty (30) days prior written notice to the other party.

2. STATUS OF AGENCY:  All individuals assigned to Client pursuant to this agreement shall, for all purposes under this agreement, be considered employees of Agency only. Agency shall assume sole and exclusive responsibility for the payment of wages to personnel for services performed by them for Client.  Agency shall assume the sole and exclusive responsibility for the payment of wages to individuals for services performed and the withholding of Federal, State and local income taxes, school district income taxes, paying Federal Social Security and Medicare income taxes, unemployment insurance and maintaining worker's compensation coverage in an amount and under such terms as required by New Jersey State Labor Law.  Agency shall provide proof of General Liability Insurance and Professional Liability Insurance for Agency, its agents and employees, with a liability limit of $1,000,000 per occurrence and $3,000,000 aggregate.  Inadequate insurance or inadequate proof of insurance is cause for termination.  Agency shall treat all staff assigned to Client as "Employees" of the Agency and not as "Independent Contractors".  Agency warrants that it is in compliance with all State and Federal laws applicable to the employment of the individuals who are referred to Client.  In order to ensure compliance of the requirements of this section, Client shall have access to Workers' Compensation, Disability Insurance, and Unemployment Insurance.  Any breach of agreement concerning: the "misclassification" of employees to "independent contractor" status, failure to withhold all applicable payroll taxes, assigning staff to client without General Liability Insurance, Professional Liability Insurance and Workers' Compensation Insurance will result in termination of contract.

Agency hereby certifies that the individuals that it supplies to Client as permanent and temporary personnel to assist Client operations are treated by Agency as its employees for

purposes of all taxes, tax withholding obligations or other required contributions that arise out of an employment relationship including, but not limited to the obligation to withhold federal and state income taxes, to pay and withhold taxes required under the Federal Insurance Contributions Act, to pay taxes required under state and local, municipal, or school district.  Agency hereby certifies that it is a member of a Worker's Compensation Program and will maintain its participation in that program.

3.  DOCUMENTATION:   Agency shall provide Client with documentation in a form satisfactory to Client which establishes that agency has, in effect, the required current Workers Compensation and Professional and General Liability insurance.  Agency shall give Client at least ten (10) days written notice prior to cancellation of or changes in coverage for any of the above policies.  Agency shall also provide Client with a completed W-9 form and Clients Supplier Information Data Sheet.

4.  QUALIFICATIONS OF PERSONNEL:  Agency agrees that each employee referred to Client shall be screened and qualified for the position to which employee is referred.  Client requires job-related background information on employees in patient care positions, for up to 7-years. **This screening/investigation WILL include, but is not limited to, names and dates of criminal history, records, from counties, federal and other agencies; social security number trace; residential history; OIG: GSA EPLS exclusions: Medicare and Medicaid excluded lists; nationwide sex offender registry; and drug screening.**  Background checks **WILL** include but will not necessarily be limited to confirmation of an individual's identity, review of an individual's criminal conviction record, if any, verification of any license, certificate, or degree required for job performance.  These records will be used to determine eligibility for clinical experiences and practice at Saint Michaels Mobile HealthCare, LLC.  Agency is responsible for guaranteeing that personnel assigned to Client's service meet and adhere to the requirements specified in "Exhibit **A**" attached hereto and incorporated into this agreement.

5.  RIGHT TO DISMISS:  Any employee referred by Agency to Client for a position requiring a certification and who does not possess a current valid certification acceptable by the State of New Jersey Administrative Code 8:40 or who is physically or mentally incapable of performing the duties required by the position where assigned, or who is determined, in good faith, by Client or its designated representatives, to be unqualified for position assigned, shall not be permitted to perform services for Client and Client shall not be required to pay for hours worked by such employee.

Agency authorizes Client and its' employees and representatives to provide any information it deems appropriate regarding Agency and any of its employees, representatives, and agents.  This information may be provided either verbally or in writing.  In addition to authorizing the release of any information, Agency fully waives any rights or claims it has or may have against Client, its agents, employees, or representatives and releases Client and its agents, employees and representatives from any and all liability, claims or damages that may directly or indirectly result from the disclosure or release of any information that could be favorable or unfavorable to employees of Client.

**Agency's operational and credentialing processes shall fully comply with all federal and state occupational safety and health regulations.  Agency also addresses clinical performance issues in order to protect patient interests, ensure the quality of care delivered by Agency's healthcare professionals, and to protect client from possible claims.**

6. CLIENT RULES & REGULATIONS:  While providing patient care service for Client, Agency personnel shall comply with all provisions of licensing law under which they are licensed, with regulations promulgated thereunder and with policies and procedures adopted by client's administration to protect the health and welfare of patients.  It shall be the responsibility of the Client to provide personnel for site specific orientation information related to its rules, regulations, policies and procedures as necessary to Agency for its employees.  The primary methodology will be conducted with New Hire Orientations and staff meeting(s) with incumbent Agency Personnel.

7. CONTINUITY OF CARE AND SERVICE:  Agency shall use its best efforts to assign the same staff to Client in order to provide maximum **patient** staffing continuity.  **Client will assign duties and clinical care assignments in support of the healthcare professionals' clinical expertise with environmental orientation to the new unit.** Agency shall have supervisors available twenty-four (24) hours per day, seven (7) days per week to perform its duties.  Agency shall provide personnel with orientation information (as outlined in #7 above), disciplinary action of staff when necessary, and oversees agency compliance with screening of applicants.  Agency shall provide proof of annual competencies and evaluations for each employee referred.  **Annual competencies** will include, but not limited to, personnel qualifications of skill and age-related competencies, **universal precautions, bloodborne pathogens, infection control,** pain, restraints, HIPAA, **patients' bill of rights,** etc.

8. NON-SOLICITATION: Client, as well as any affiliates agree, during the term of this Agreement, and for a period of twenty-four (24) months following the termination of this Agreement, they will not solicit, hire or offer employment to Agency's employees or representatives directly or indirectly or through another agency.

9. PAYMENT TERMS:  See "Exhibit B"

10. COMPENSATION:  Agency shall bill Client for services in accordance with the schedule of rates appended hereto in "Exhibit **B**".  The schedule of rates may only be amended by mutual agreement of both parties and upon thirty (30) days written notice and will be reviewed annually.  Before leaving the service, **and/or overtime** must be documented by the Agency AND approved in writing by the client's management.

11. This agreement, its validity, performance and all other questions arising hereunder, shall be governed by and construed in accordance with the laws in the State of New Jersey.

12. Agency confirms that it has not been excluded by the Federal government from participation in any governmental programs nor, to the best of Agency's knowledge, has agency or any of its employees been proposed for exclusion.  Agency agrees to notify the Client's Purchasing Manager immediately upon agency receiving written or verbal

notification that agency is proposed for exclusion from any governmental health care program.

13. COMMUNICATION PROTOCOL: The Saint Michaels Mobile HealthCare, LLC. Purchasing Department will be responsible for administering this contract.  Any changes or amendments to this contract must be coordinated with a buyer from this department. Authorized changes or modification(s) to any part of this agreement must be in writing and signed by authorized personnel from Agency and Client.

14. Based on periodic audits, Client reserves the right to refuse or discontinue the service of any individual, which in the opinion of Client is not performing.  The Coordinator will phone unfavorable comments and/or concerns regarding personnel performance to the Shift Supervisor.  Rationale for requesting a person not to return will be discussed with the staff member at the Client's request.

In the event a healthcare professional placed by Agency accepts permanent employment with Client, Client shall have no further financial obligation to Agency, provided the healthcare professional completes the current assignment before beginning permanent employment.

15. Agency must comply with the Americans with Disabilities Act of 1990 (ADA).  All qualified individuals with a disability who can perform the "essential functions" of a job, with or without reasonable accommodation by the employer, are protected by ADA employment provisions.

16. PARKING:  The Client shall provide parking, at no cost, to all Agency employees at the client's facility.

17. SITE VISITS:  Client reserves the right to make periodic site visits of Agency.  All site visits and evaluations shall be performed in such a manner as will not unduly interfere with or delay ongoing work.  These evaluations may involve inspection of employee personnel records, monthly state comp reports, quarterly payroll records, and other financial records.

18. PROTECTED HEALTH INFORMATION:  To the extent that the Agency and/or supplemental staff comes into contact with identifiable patient health information, Agency and/or supplemental staff agrees it will maintain such information to meet all mandatory federal, state and local regulations, including JCAHO and HIPAA regulations, existing and future.  **Client will verify the identity and credentials of each Healthcare Professional by a visual check of the Healthcare Professional's photo identification and professional license or certification.**

19. This agreement specifies that the Client retains professional and administrative responsibility for the services rendered.  The **Agency,** when acting as a consultant, shall apprise the administrator of recommendations, plans for implementation and continuing assessment through dated and signed reports which shall be retained by the administrator for follow-up action and evaluation of performance.

20. PARTIAL INVALIDITY:  In the event any provision of this agreement is found to be legally invalid or unenforceable, those provisions shall be revised to the degree allowed by law or shall be severed, and the remaining provisions of this agreement shall remain in full force and effect.

21. INDEMNIFICATION: Client and Agency agree to indemnify and hold each other harmless against any and all claims, losses, damage or expenses arising from the sole, negligent, or willful misconduct of their respective representatives.

*Rest of this page intentionally left blank*

In consideration of the promises contained herein, the parties to hereby execute this agreement.

CLIENT

NJ MOBILE HEALTHCARE LLC.

By: _____

Title: CEO _____

E-Mail: louis.greco@njmhc.com

Date: 09/16/2024

Louis Greco
Contact Person Name

201-660-1600
Contact Person Phone #

louis.greco@njmhc.com
Contact E-Mail

Rick Rubenstein
Accounts Receivable Contact Person

201-660-1600
Accounts Receivable Person Phone #

rick.rubenstein@njmhc.com
Accounts Receivable Person E-Mail

AGENCY NAME

<mark>TRI-STATE   MEDICAL   HOLDINGS</mark> LLC

By: Adam Deutsch _____

Title: President _____

E-Mail: adeutsch@tristatemedgroup.com

Date: 09/15/24

**EXHIBIT A**
**Personnel Requirements**

**Emergency Medical Technician**

**Requirements:**
- Valid EMT Certification from NJ, NY, DE, DC, MD, NC, PA, VA or WV
- Must have a valid driver's license
- Must possess a valid CPR card
- High School Diploma or GED
- Preferred two years' experience in a 9-1-1 or emergency EMS setting
- Certification in Pre-Hospital Trauma Life Support (PHTLS) or International Trauma Life Support (ITLS).
- ICS 100 and 200
- IS 700 and 800 – current versions
- Hazardous Materials Awareness
- WMD / CBRNE Awareness
- CEVO 4 certificate
- Annual competencies in Blood Borne Pathogens, Hazard Communications, and Respiratory N95 Fit Testing
- Successful clearance from criminal background check
- Negative Drug / illicit substances screening

**Responsibilities:**
- Responds to instructions from emergency medical dispatchers and performs assignments in a timely manner.
- Operates emergency vehicles in accordance with regulations and company policy.
- Assures proper stocking, re-stocking and maintenance of medical supplies and equipment.
- Provides accurate and timely written and typed communication on patient disposition.
- Provides patient assessment, treatment and transport within applicable regulations.
- Attends company mandated staff sessions.

**EXHIBIT B**
**Statement of Work and Pricing Proposal**
**NJ Mobile HealthCare**

1.  The Client will provide staffing for BLS ambulance services consisting of two Emergency Medical Technicians per ambulance / unit.
2.  Each Operational Hour, as outlined in 1, will be charged at a rate of $75.00
3.  Initial Staffing will consist of:
    a.  One (1) Twenty-Four Hour, 365 Days a year Basic Life Support Ambulance
4.  Agency shall bill NJ Mobile HealthCare on Net 60 Day Terms.  Invoicing shall be submitted weekly.
5.  If NJ Mobile HealthCare requires additional Basic Life Support Ambulance / Unit staffing, an additional $75.00 per hour will be charged.